TIFFANY STUDIOS, Plaintiff, *v.* JACOB SEIBERT, JR., and Others, as Executors of and Trustees under the Last Will and Testament of WILLIAM B. DANA, Deceased, and Others, Defendants.

First Department, July 13, 1917.

Assignment — when assignee of beneficiary in will entitled to proceeds of lands taken by eminent domain — will — power of sale construed — when condemnation of lands equivalent to sale by testamentary trustees.

Submission of a controversy upon an agreed statement of facts pursuant to the Code of Civil Procedure. The plaintiff, a creditor of a beneficiary under a will and as assignee of her interest in moneys which were the proceeds of lands of the estate taken by eminent domain and held by the executors, claims to be entitled to the share of the assignor and asks · that the executors be required to pay over the same. The defendant executors contend that, under the terms of the will, the plaintiff's assignor could only become entitled to the proceeds of the land in case they were voluntarily sold by the trustees under a discretionary power given by the will, and that the taking of the lands by eminent domain was not such sale as vested the assignor with any interest in the proceeds.

*Held,* that the taking of the lands by eminent domain was in fact a sale within the meaning of the will which, as construed by the court, entitled the assignor to share in the proceeds without restriction and that the only discretion conferred upon the executors related to the price and terms of sale.

When the proceeds of the lands taken by eminent domain were received by the testamentary trustees in cash they became personal property and subject to distribution under the terms of the will.

LAUGHLIN, J., dissented.

SUBMISSION of a controversy upon an agreed statement of facts pursuant to section 1279 of the Code of Civil Procedure.

*Robert Thorne,* for the plaintiff.

*Winthrop E. Dwight* and *Jacob Seibert, Jr.,* for the defendants Jacob Seibert, Jr., and others.

*Alfred Ely,* for the defendants Davis Collamore & Company, Ltd., and others.

*Harold S. Deming,* for the defendant William Shepherd Dana, individually and as trustee.

DOWLING, J.:

William B. Dana died on October 10, 1910, leaving a last will and testament dated April 12, 1909, and a codicil thereto dated September 13, 1910, which were duly admitted to probate in the county of Suffolk, State of New York, on November 28, 1910. Three separate trusts were created under these instruments. The first was of his holdings of capital stock in the William B. Dana Company, which he left to Jacob B. Seibert, Jr., and Ethel Dana Shepherd in trust, to receive the income thereof for certain designated purposes and periods, with the following provisions:

" I empower my said trustees, however, at any time in their discretion to sell all of said stock in one block at public or private sale at such prices and upon such terms as they may determine, and to invest and reinvest the proceeds in any manner in their discretion, being free from the usual restrictions as to trustees' investments, the income of such substituted investments to be disposed of in like manner as is above directed with respect to the income of the stock. At the expiration of such trust, I give and bequeath and direct my said trustees to transfer and deliver three hundred shares of said stock, or substituted investments representing the proceeds of sale of such proportion of said stock, to Jacob Seibert, Jr.; * * * and the remainder of such stock or the substituted investments representing the proceeds of sale of the remainder of such stock, I give and bequeath and direct my said trustees to transfer and deliver to William Shepherd Dana."

The second trust (which is the subject of this controversy) is thus set forth in the will:

" *Third.* I give and devise to my executors all my right, title and interest in and to the parcels of real estate with the appurtenances, situated in the Borough of Manhattan, in the City of New York, known as number 76½ Pine Street, and numbers 142 to 150 Worth Street, and 3 to 6 Mission Place, and number 17 Ann Street, and also all my estate known as Greycliff, in Englewood, New Jersey, and all my other real estate in New Jersey, except that hereinafter expressly devised in the eighth and ninth paragraphs hereof, IN TRUST, to hold the same and collect the rents, issues and

profits thereof, so long as William Shepherd Dana, my adopted son, shall live and twenty-one years shall not have expired and to pay the same, after the deduction of all proper charges and expenses to the persons entitled to the residue of my estate according to the provisions hereof and in the same proportions. I authorize my executors to lease any or all of said real estate, or at any time during the continuance of this trust to sell any or all of the same at such prices and upon such terms as they may deem advisable. I also empower my executors to mortgage parcels of my real estate for the purpose of providing money for improving such parcels. In the event of any such sale I direct my executors to thereupon terminate the said trust to the extent of the property so sold and to pay the net proceeds of such sale to the persons entitled to the residue of my estate according to the provisions hereof and in the same proportions. Upon the termination of this trust by limitation of time or by the death of my adopted son, William Shepherd Dana, I give and devise such of said real estate as shall then remain unsold to the persons entitled to the residue of my estate according to the provisions hereof and in the same proportions." There is then a third trust created of premises 136 to 140 Front street, New York city, the income wherefrom is to be paid to Ethel Dana Shepherd and William Shepherd Dana for life, and it is provided: "I authorize my executors to lease said premises, or, at any time during the continuance of this trust, to sell the same at such price and upon such terms as they may determine, and to invest and reinvest the proceeds in any manner in their discretion, being free from the usual restrictions as to trustees' investments. The income of such substituted investments to be disposed of in like manner as above directed with respect to the rents, issues and profits of the said premises. Upon the death of both Ethel Dana Shepherd and William Shepherd Dana, I direct my executors to convey the said premises or to transfer and pay over the investments representing the sale of said premises to the issue of William Shepherd Dana, or if there be no such issue, then to the person entitled to the residue of my estate, according to the provisions hereof and in the same proportions."

The testator then devised his land at Mastic, N. Y., to Ethel

Dana Shepherd and William Shepherd Dana for life with remainder to the issue of the latter. He bequeathed certain personal property in various houses to the same two persons and made devises and bequests to various individuals, including a devise to Ethel Dana Shepherd of a lot of land 300 feet square fronting on Floyd street, Englewood, N. J. His residuary estate he divided into five shares, whereof two each were bequeathed to Ethel Dana Shepherd and William Shepherd Dana.

By his codicil he first devised and bequeathed his land known as "Moss Lots" at Mastic, N. Y., with the personal property therein and thereon and the personal property at Greycliff, Englewood, N. J., or in storage, to Ethel Dana Shepherd for life, and after her death to William Shepherd Dana or his issue; or if he should die without issue prior to the death of Ethel Dana Shepherd, then to the latter absolutely.

As to the second trust the codicil provided:

"I give and devise to my Executors all my right, title and interest in and to the parcel of real estate with the appurtenances situated in the Borough of Manhattan in the City of New York, known as No. 76½ Pine Street and Nos. 142 to 150 Worth Street, and Nos. 3 to 6 Mission Place, and No. 17 Ann Street, and also my Estate known as Greycliff in Englewood, N. J., and all my other real estate in New Jersey, except, that expressly devised in paragraph numbered eighth to ninth of my said Last Will and Testament, IN TRUST, to hold the same and collect the rents, issues and profits thereof so long as William Shepherd Dana, my adopted son, shall live and twenty-one (21) years shall not have expired since my death, and to pay the same after the deduction of all proper charges and expenses to Ethel Dana Shepherd [and William Shepherd Dana] in equal portions during their lives, the survivor to receive during his or her life the portion which the deceased would have received if living. I authorize my Executors to lease any or all of said real estate, or at [any] time during the continuance of this trust to sell any or all of the same at such prices and upon such terms as they may deem advisable. I also empower my Executors to mortgage any parcel of my said real estate for the purpose of providing money for improving said parcel. In the event of any such

sale, I direct my Executors to thereupon terminate the said trust to the extent of the property so sold and to pay one-half of the net proceeds of such sale to Ethel Dana Shepherd, or if she be not living, to William Shepherd Dana, or if he be not living, to his issue, and the other half of the net proceeds of such sale to William Shepherd Dana. Upon the termination of this trust by limitation of time or by the death of my adopted son, William Shepherd Dana, I give and devise such of said real estate as shall then remain unsold, one-half to Ethel Dana Shepherd and one-half to William Shepherd Dana, or if he be not living, to his issue."

Prior to the making of either the will or codicil, and on March 22, 1905, William B. Dana had made a trust deed of 655 shares of capital stock of the William B. Dana Company to Jacob Seibert, Jr., the income therefrom to be paid to Dana during his life and at his death to Ethel Dana Shepherd during her life, and upon her death to William Dana Shepherd during his life. The deed contained the following provisions:

" Should the Executor or Executors of my last Will and Testament decide to sell the stock of William B. Dana Company which may form part of my estate at my death, and arrange to include the shares held in this trust as part of the sale, my said Trustee, upon the request of my said Executor or Executors, shall sell such shares, provided the price and terms are as favorable as those accorded to the stock belonging to my estate. And my said Trustee is empowered to invest the proceeds and to dispose of the income from such substituted securities in like manner as above directed."

After Mr. Dana's death and in the year 1911, Mrs. Shepherd had the house at Mastic, L. I., then occupied by herself and her son William Shepherd Dana, decorated and furnished by the Tiffany Studios at an expense of $42,208.10. She then represented to plaintiff that she was unable to pay the entire cost at once, but would make a payment of $1,000 and give her notes for the balance, and she stated that she had a large income from the Dana estate and expected to shortly receive a large amount under the Dana will, which would enable her to liquidate the entire indebtedness before all the notes became due. In fact she did pay notes aggre-

gating $6,000, and the interest thereon, but the balance of
$36,208.10 with interest still remains due. On August 7,
1912, Mrs. Shepherd executed to plaintiff an assignment of
her share of the proceeds of sale of the premises 142–150
Worth street, New York city (embraced in the second trust)
as security for her indebtedness to it, the assignment to cover
either the proceeds of sale or the taking of the property by the
city of New York in condemnation proceedings, it being
recited that she was " entitled under the said last will and
testament of William B. Dana, deceased, in the event of and
upon the sale of said premises to be paid and to receive and
have individually for herself one-half of the proceeds thereof."
William Shepherd Dana became of age November 1, 1913.
From testator's death up to this date his mother had received
about $21,000 as his guardian and $33,000 on her own account
from the several trust funds. Meantime, title to the properties
142 to 150 Worth street and 3 to 6 Mission place (embraced
in the second trust fund) had been taken by the city of New
York in condemnation proceedings and on October 8, 1913,
the sum of $282,049.80 was paid over to and received by the
trustees of the Dana estate as the fair price or value of the
said properties as found and determined in the condemna-
tion proceedings, and which funds, less the necessary expenses,
are now in the hands of the trustees. Mrs. Shepherd died
June 27, 1914, leaving a last will and testament, but practically
no estate except her claim to one-half of the proceeds of sale
of the premises in question. The statement of fact shows
that she had lived extravagantly, that there were twenty-
three unsatisfied judgments of record against her, that she
had executed some thirty-one assignments of interest in the
proceeds of sale of the property taken by the city to secure
indebtedness and that she was also indebted to one of the
executors. But it is conceded that plaintiff dealt with her
in good faith and in ignorance of her debts and extravagance.
The trustees have refused to recognize the assignment to
plaintiff, denying that Mrs. Shepherd was entitled to receive
any part of the sum paid by the city for the premises in
question, on the ground that no sale thereof was had within
the meaning of the will. The sole question presented by
this submission is whether the acquiring by the city of New

York in condemnation proceedings of the title to the property in question and the payment therefor in cash by the city of New York to the executors and trustees of the Dana estate constituted a sale of the said property within the meaning and the intention of the provisions of the will and codicil of deceased. Plaintiff claims it did, and that the proceeds of said property so received by the trustees became immediately payable to Ethel Dana Shepherd and William Shepherd Dana. The executors and trustees claim that it did not and that the proceeds of such taking by the city should be held and administered by the trustees in accordance with the terms of the trust created by the will and codicil.

The first question to be considered is whether the taking of the land in question by the right of eminent domain, is a sale of the property taken. I think this must be answered in the affirmative. In *Bell Telephone Company* v. *Parker* (187 N. Y. 299) Judge BARTLETT said: " In the view of the law the condemnation proceeding, when carried to a conclusion favorable to the plaintiff, operates as a purchase of the land or an interest therein for the sum fixed by the commissioners." In *Hunter* v. *City of New York* (151 App. Div. 30) the court held: " Acquiring property by condemnation in a legal sense is a purchase and sale of the land, or of the interest authorized to be taken." And in *Cruger* v. *Union Trust Company* (173 App. Div. 797) Mr. Justice McLAUGHLIN said (pp. 803, 804) as follows: " It is also contended by the defendant that the award received by the trustee for the interest in the pier referred to should be deemed realty and for that reason not affected by the revocation. This interest was conveyed to the trustee by the plaintiff and was acquired by the city in a condemnation proceeding, in which title vested in February, 1914. The award, amounting with interest to over $11,000, was not paid to the trustee until February 23, 1916, shortly before the attempted revocation. As to this award, I am of the opinion that when it was received by the trustee in cash it constituted personal property under the decision in *Sperry* v. *Farmers' Loan & Trust Co.* [154 App. Div. 447]. Under the trust indenture the trustee was authorized to sell all or any part of the real estate and invest the proceeds in specific securities, reinvestment in real

estate not being permitted without the written consent of the plaintiff. If the trustee had voluntarily sold the interest in the pier to the city the proceeds would unquestionably have been personal property. The fact that the trustee parted with the interest by operation of law can make no difference. In the *Sperry* case, where the trust property conveyed consisted almost entirely of an undivided interest in realty, which was sold under a testamentary power, the court held that the proceeds paid to the trustee were personalty. It is true the award takes the place of land and is to be considered as realty for the purpose of determining to whom the same should be paid. If the plaintiff had revoked the trust as to the personalty before the award had actually been paid over to the trustee, then the authorities cited by the defendant might be applicable, and there would be presented a question whether the revocation could affect it; but once the moneys were paid over to the trustee, their identity was lost and there is no more reason for considering that sum as realty than the proceeds of any of the other real estate voluntarily sold by the trustee." (See, also, *Vandermulen v. Vandermulen*, 108 N. Y. 195.)

But, even if the taking by the city be deemed to be a sale of the property taken, was it a sale within the meaning of the will? The executors and trustees urge that it was not; that the sale contemplated by the will was one within the control and volition of the trustees; that they were to determine the circumstances when a sale should be wise and proper; that they were to exercise their discretion as to whether a sale should be had, having in mind whether the welfare and best interests of the beneficiaries would be subserved by giving them money, whether the sale was advantageous as to price, and whether an emergency had arisen which called for distribution of the principal of the estate. In other words, the trustees were to decide whether a sale should be had or not, with a view not only to its effect upon the estate but upon the beneficiaries as well. It is claimed that both the intention and the reasonable meaning of the testator in regard to the property in question were that the trustees should exercise their voluntary discretion as to whether it was advisable that the property should be sold and the proceeds of such sale

given to the beneficiaries of the trust; that the trustees have in no way exercised any discretion, and that for the court to determine that the taking of the property by condemnation was such a sale as was contemplated by the will, would be to introduce therein an entirely different meaning and intention than that expressed by the testator. The difficulty with this contention is, that it reads into testator's will a much broader discretionary power than testator conferred. While testator may have meant to guard some of the trust estates created by him from the danger of being dissipated, and, therefore, carefully provided for the continuance thereof during the lifetime of Mrs. Shepherd and her son, he did not mean that she should have none of the principal of his estate, for he left her some real and personal property outright and gave her absolutely two-fifths of his residuary estate. Moreover, while he was most exact and definite in his provisions for the reinvestment of the proceeds of any sale of the properties embraced in the first and third trusts in his will, as well as in the trust deed, with equal exactness and definiteness, he not only omitted any reference to any reinvestment of the proceeds of any sale of the property embraced in the second trust, but provided explicitly for the immediate termination of that trust as to all or any of such property when sold. There is a clear proof of the intent and meaning of the testator that Mrs. Shepherd and her son should have the proceeds of any sale thereof, without restriction or delay of any kind, and without any discretion vested in his executors to withhold their shares, no matter what their views might be as to the expediency of paying the money over to them. The will confers no discretion upon the executors save as to the prices and terms of sale; that is, the adequacy of the price and the sufficiency of the terms. They were neither directed nor authorized to make a sale having in mind the situation of the rest of the estate, nor the advisability of allowing Mrs. Shepherd and her son to have the control of the proceeds. The latter phase the testator determined himself by ordering that the money should be paid to them as soon as the sale was made. The only discretion the executors were to exercise was as to whether they were getting full value for the property and upon terms that insured full payment

First Department, July, 1917. [Vol. 178.

of the purchase price. That exercise of discretion was met and satisfied by a taking of the property by the city, when its full value must be assumed to have been awarded and by payment of the whole consideration in cash.

Judgment will, therefore, be directed that the taking by the city of New York in condemnation proceedings of the properties described in the 3d clause of the will of William B. Dana, deceased, and in the codicil thereto, was a sale of the said properties within the meaning and intention of said will and that the proceeds of said properties so received by the executors and trustees of said William B. Dana, deceased, became and was immediately distributable and payable to William Shepherd Dana and Ethel Dana Shepherd, or her assignees, in equal parts, subject only to the expenses of the said executors and trustees; and that a reference be ordered herein to determine the rights and priorities as between themselves of the defendants and of any other parties claiming to have any interest in said moneys by virtue of assignment, judgment, lien or otherwise; and that upon the coming in of the report of such referee, the said executors and trustees of said William B. Dana, deceased, be directed to pay over the said one-half of said money received from the city of New York, together with the interest and income thereon since the receipt thereof by said executors, less the expenses, to the person who shall be found entitled thereto. Costs and disbursements of this submission are awarded to all the parties who have submitted briefs thereon, payable out of said fund.

CLARKE, P. J., SMITH and PAGE, JJ., concurred; LAUGHLIN, J., dissented.

Judgment directed as stated in opinion; costs to all parties who have submitted briefs herein, payable out of the fund. Order to be settled on notice.